## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NVR, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) 2:16-cv-00722 |
| v. | ) |
| | ) |
| MOTORISTS MUTUAL INSURANCE | ) |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

This is an insurance coverage dispute stemming from two lawsuits concerning the explosion of a propane heater on a construction site. The Plaintiff, NVR, Inc. ("NVR") is an additional insured on a Commercial General Liability policy provided by the Defendant, Motorists Mutual Insurance Company ("MMIC"). NVR seeks a declaratory judgment defining its rights with respect to its demand for insurance coverage relating to two actions filed in the Court of Common Pleas of Allegheny County, Pennsylvania. (Am. Compl. ¶ 1, ECF No. 9). NVR asserts that MMIC failed to defend and/or indemnify NVR for their involvement in a lawsuit brought by an individual against NVR, and further alleges that MMIC did so in bad faith. MMIC counters by arguing that it had no duty to indemnify NVR or provide a defense to it in the lawsuit because NVR failed to provide timely notice of the suit in contravention of the insurance policy, and that MMIC was prejudiced as a result. NVR also seeks indemnification for its expenses and fees incurred in bringing a property damage action related to the same explosion against one of its contractors. MMIC argues that this claim is not covered by the policy.

In Count I of the Amended Complaint, NVR seeks a declaration that MMIC has a duty to

-1-

defend and/or indemnify NVR in connection with the personal injury lawsuit filed against them by the individual. (Am. Compl. ¶¶ 80–88). Count II is a breach of contract claim related to MMIC's alleged refusal to defend and indemnify NVR in connection to the same lawsuit. (*Id.* ¶¶ 89–97). Count III is a separate breach of contract claim related to MMIC's alleged refusal to indemnify NVR with respect to any of the claims asserted by NVR for the property damage that NVR incurred from the propane heater explosion. (*Id.* ¶¶ 98–106). Count IV alleges that MMIC's refusal to defend and/or indemnify NVR in these matters was in bad faith. (*Id.* ¶¶ 107–37).

Now before the Court are cross-motions for summary judgment filed by both parties. (ECF Nos. 74, 78). Both parties seek the entry of summary judgment in their favor on all counts. The matters have been fully briefed, (ECF Nos. 92, 95, 103, 106, 109, 113), and are now ripe for disposition. For the reasons that follow, NVR's Motion (ECF No. 74) will be DENIED and MMIC's Motion (ECF No. 78) will be GRANTED.

## I. BACKGROUND

The following facts are undisputed. Plaintiff, NVR, is a company that performs residential construction services. (Am. Compl. ¶ 14). NVR retained Rusmur Floors, Inc. ("Rusmur") to install flooring at a housing development being built by NVR in Allegheny County, Pennsylvania. (MMIC CSF ¶ 10, ECF No. 96). This dispute stems from an incident that occurred on February 28, 2011, on one of NVR's residential construction project properties at which Rusmur was performing flooring work. On that date, Gary Loy was severely burned and injured when a defective propane heater exploded. (NVR CSF ¶¶ 1–2, ECF No. 93). Loy brought a lawsuit in the Allegheny Court of Common Pleas on March 13, 2012, for his personal injuries sustained during the incident. (*Id.* ¶ 4; *Loy v. NVR, Inc.*, No. GD-12-004835 (Pa. Ct. Com. Pl. 2012) [hereinafter the "Loy Litigation Matter"]). Loy brought suit against a number of defendants, including NVR

and Rusmur.[1] (*Id.*). NVR denied that it was negligent and maintained that Loy's injuries were solely attributable to other named defendants in the actions, including Rusmur. (*Id.* ¶ 5). In connection with the same incident, but in a separate lawsuit, NVR filed suit against Rusmur and a number of other defendants on June 13, 2012, in the Allegheny Court of Common Pleas for property damage at the construction site. (*Id.*; *NVR, Inc. v. Loy*, No. GD-12-010262 (Pa. Ct. Com. Pl. 2012) [hereinafter the "NVR Property Damage Matter"]).

At the time of the propane heater explosion, NVR and Rusmur were operating under a Master Contractor Agreement ("MCA") which applied to all work performed by Rusmur for NVR and subcontractors performing work on Rusmur's behalf for NVR. (NVR CSF ¶ 10). Per the MCA, Rusmur was required to carry commercial general liability ("CGL") insurance. (*Id.* ¶ 11). The relevant language from the MCA is as follows:

### SECTION 7: INSURANCE

At all times while performing the Work, and for a period of two (2) years thereafter, Contractor will maintain for the benefit of itself and NVR the following minimum insurance coverages:

\* \* \*

**C. Commercial General Liability Insurance** with bodily injury and property damage limits set forth in Amendment A, and with a contractual liability endorsement covering Contractor's obligations set forth in Sections 3 and 8 of this Agreement in such amounts as NVR may from time to time request, but in no event less than those set forth in Attachment A.

\* \* \*

Contractor shall add NVR as an "Additional Insured" on the above Commercial General Liability and Commercial Automobile Liability policies. All insurance policies will provide an endorsement for a waiver of subrogation in favor of NVR, Inc. Further, all insurance policies will provide that Contractor's insurance policies will be considered primary despite any insurance policies in place by NVR. Contractor also agrees to cause its

---

[1] Rusmur is not a party to this action.

subcontractors to maintain insurance coverage identical to the coverage set forth in Sections 7(A), 7(B), 7(C) and 7(D), all of which shall name NVR as an additional insured, and if they do not have such coverages, Contractor recognizes and acknowledges that it shall bear exclusive liability for any claims arising by reasons of the actions or failures to act of its subcontractors.

Contractor will provide to NVR current certificates of insurance or other appropriate evidence of compliance with the provisions of this Section 7 promptly after the signing of this Agreement and before any Work commences, and on or before the anniversary date of each policy during which Work is to be performed. Each certificate of insurance shall contain an unqualified clause to the effect that the policy shall not be subject to cancellation, nonrenewal, adverse change, or reduction in amounts of coverage without thirty (30) days prior written notice to NVR.

(NVR-Rusmur Master Contractor Agreement (the "MCA") at 4, ECF No. 94-7).

Defendant MMIC issued a Commercial General Liability Policy, form number CG 0001 (12-07), to Rusmur, bearing policy number 33-276184-20E (the "Policy"). (MMIC CSF ¶ 1, ECF No. 96; CGL Policy Issued by Defendant (the "Policy"), ECF No. 94-8). The Policy was later amended to designate NVR as an additional insured subject to the terms of the endorsement and the Policy. (MMIC CSF ¶ 2). NVR was an additional insured on the Policy during the time period encompassing this incident. (NVR CSF ¶ 12). Section I of Coverage A of the Policy provides coverage for "sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies." (Policy at 18). The Policy states that MMIC has "the right and duty to defend the insured against any "suit" seeking those damages." (*Id.*).

The Policy also contains a provision that requires that an insured provide notice to MMIC of any pending claims against the insured. The relevant language is as follows:

## Section IV – COMMERCIAL GENERAL LIABILITY CONDITIONS

\* \* \*

### 2. Duties In The Event Of Occurrence, Offense, Claim Or Suit

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize use to obtain records and other information;

**(3)** Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(Policy at 28). For the purposes of the Policy, "you" is defined as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (*Id.* at 18). An "insured" is "any person or organization qualifying as such under Section II – Who Is An Insured." (*Id.*). Section II was amended to include NVR as an "insured" under the Policy. (*Id.* at 17). Neither party disputes that NVR qualifies as an "insured" under the Policy. (NVR CSF ¶ 12).

On March 28, 2012, fifteen days after the state court complaint in the Loy Litigation Matter was filed, MMIC acknowledged in writing that it received "suit papers filed against" Rusmur. (ECF No. 97-11). The same correspondence indicated that MMIC was assigning Rusmur's defense to the law firm of Summers, McDonnell, Hudock, Guthrie & Skeel. (*Id.*). According to James Sack, NVR's General Counsel and Rule 30(b)(6) corporate designee, NVR did not request a defense from MMIC because they believed that it was not necessary for them to do so because MMIC was already involved in the case by virtue of Rusmur's involvement. (Second Deposition of James Sack ("Sack Dep. II") at 22:2–10, ECF No. 97-10).

At the time of the propane heater explosion, NVR was a named insured on a Commercial General Liability Policy provided by AIG/Chartis. (ECF No. 97-6). This policy, like the Policy between MMIC and Rusmur, is on a Commercial General Liability CG 0001 (12-07) ISO form. (*Id.*). The AIG/Chartis Policy provided that NVR was responsible for the first $350,000 in claims and expenses (the "retained limit") and that AIG/Chartis would reimburse NVR for expenses above this amount that were incurred in defending itself from liability for an occurrence under the Policy. (*Id.*; *see also* ECF No. 97-7). On March 19, 2012, six days after the state court complaint

in the Loy Litigation Matter was filed, a Senior Risk Analyst from NVR acknowledged receipt of the complaint and instructed a third-party administrator to "place [NVR's] carrier on notice" of the complaint. (ECF No. 97-8). NVR notified AIG/Chartis of the propane heater explosion "[w]ithin a few days" of its occurrence. (First Deposition of James Sack ("Sack Dep. I") at 30:8–11, ECF No. 97-1).

Both the Loy Litigation Matter and the NVR Property Damage Matter were mediated on August 14, 2015. (NVR CSF ¶ 21). The mediation was attended by representatives from NVR and their counsel, representatives from Rusmur and their counsel, and a representative from MMIC on behalf of Rusmur. (*Id.*). A claims representative from AIG was also present at the mediation on behalf of NVR. (Sack Dep. I at 53:16–25). At the mediation, NVR made an oral demand upon MMIC for payment of its defense and full indemnification for both the Loy Litigation Matter and the NVR Property Damage Matter. (MMIC CSF ¶ 55). This was the first such request made by NVR, and MMIC denied the request. (*Id.* ¶¶ 55–57). The Loy Litigation Matter and NVR Property Damage Matter were both settled at the mediation. (Joint Stipulation ¶¶ 1–2, ECF No. 90). NVR never served a formal notice of tender of defense letter upon MMIC in connection with the NVR Litigation Matter or the NVR Property Damage Matter. (Sack Dep. I at 54:22–24).

James Sack, NVR's Rule 30(b)(6) corporate designee, testified that NVR "fronted" some money to AIG "in order to get the case settled" on the day of the mediation. (Sack Dep. II at 34:18–21). AIG had agreed to reimburse NVR for any amount in excess of the $350,000 retained limit under their CGL policy. (*Id.* at 34:18–35:9; *see also* ECF No. 97-7). Following the mediation, NVR submitted defense bills to AIG for reimbursement for legal fees incurred in the Loy Litigation Matter. (MMIC CSF ¶ 80). On June 10, 2016, AIG tendered a check to NVR in the amount of $439,100.20 and the "Reason for Payment" was given as "GARY LOY V. NVR". (ECF No. 97-

20). Counsel for NVR explained that AIG neglected to deduct NVR's deductible and NVR thereafter processed a reimbursement to AIG in the amount of $350,000. (MMIC CSF ¶ 82). NVR claims damages of $351,494.37 for the Loy Litigation Matter, which includes $200,000 for settlement as well as attorney fees and other expenses. (*Id.* ¶ 83; *see also* ECF No. 97-5). NVR also claims $125,661.87 of damages related to the NVR Property Damage Matter. (*Id.*).

## II. APPLICABLE LEGAL STANDARD

A court shall grant summary judgment if the movant shows that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Summary judgment must be granted "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). But, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The moving party bears the initial burden of demonstrating that there are no genuine disputes of material fact. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1362 (3d Cir. 1992) (citing *Celotex*, 477 U.S. at 323). The standard of review is the same on cross-motions for summary judgment—each moving party must independently establish that there is no genuine issue of material fact. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). If a moving party satisfies this burden, the opposing party must designate specific facts in the record that show

that there is a genuine, material factual dispute to be resolved at trial. *Celotex*, 477 U.S. at 324. The non-moving party may rely on its own affidavits or on the "depositions, answers to interrogatories, and admissions on file" to designate these facts, but may not rely solely on its own pleadings. *Id.*; *see also Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989). "A fact is "material" if, under the substantive law of the case, it is outcome determinative." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 129 (3d Cir. 1998) (citing *Anderson*, 477 U.S. at 247–48). Thus, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).

The Court's subject-matter jurisdiction in this case is based on the diversity of citizenship between the parties. 28 U.S.C. § 1332(a)(1). Accordingly, the choice-of-law questions will be determined under the law of the forum state—Pennsylvania. *Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008). Neither party disputes that Pennsylvania law applies to this case, and the Court has so held. *NVR, Inc. v. Motorist Mut. Ins. Co.*, No. 16-722, 2016 WL 6952358, at *1 n.1 (W.D. Pa. Nov. 28, 2016).

## III. ANALYSIS

The parties have developed an extensive record regarding the underlying litigation and the instant insurance dispute. Here is the situation, in its simplest form, as the Court sees it. Rusmur was the Named Insured on an insurance policy provided by MMIC. NVR was an additional insured on that Policy. An accident happened for which Rusmur and/or NVR could be liable, and both companies were sued. Rusmur notified MMIC of the accident and lawsuit and MMIC provided a defense for Rusmur. NVR did not notify MMIC and NVR provided its own defense, which necessarily meant that it was incurring expenses along the way. Over three years later, at a

-9-

mediation, NVR asked MMIC—for the first time—to defend it and indemnify it in connection with the underlying lawsuits. MMIC refused, claiming late notice and prejudice. NVR cried foul, claiming that MMIC knew about these lawsuits the whole time. There are other factual details and disputes—some material and some not—but in a nutshell, that is how we got to this point.

In the Court's estimation, this dispute boils down to the following questions: (1) What was the scope of the Policy's coverage? (2) Did NVR comply with the notice provisions of the Policy? (3) If NVR failed to comply, was MMIC prejudiced by such noncompliance? (4) Could any of MMIC's refusals to provide coverage constitute bad faith?

An insured or an insurer may bring a declaratory judgment action in order to "interpret the obligations of the parties under an insurance contract, including the question of whether an insurer has a duty to defend and/or a duty to indemnify a party making a claim under the policy." *Am. Nat. Prop. & Cas. Cos. v. Hearn*, 93 A.3d 880, 884 (Pa. Super. Ct. 2014) (quoting *Gen. Accident Ins. Co. of Am. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997)). The "first step in a declaratory judgment action concerning insurance coverage is to determine the scope of the policy's coverage." *Allen*, 692 A.2d at 1095. This is a legal question that can be resolved at the summary judgment stage. *See Minn. Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004) ("The interpretation of an insurance contract regarding the existence or non-existence of coverage is generally performed by the court.") (internal quotations omitted); *see also Verticalnet, Inc. v. U.S. Specialty Ins. Co.*, 492 F. Supp. 2d 452, 456 (E.D. Pa. 2007) (applying Pennsylvania law and deciding an insurance coverage policy dispute on summary judgment).

Under Pennsylvania law, an insurance contract is construed according to its plain meaning when the document is read in its entirety. *Frog, Switch & Mfg. Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999). "In interpreting an insurance policy, a court must ascertain the intent of

the parties as manifested by the language of the written agreement." *Riccio v. Am. Republic Ins. Co.*, 705 A.2d 422, 426 (Pa. 1997). "The Court should not consider individual terms removed from their context, but should instead consider the entire contractual provision to determine the intent of the parties." *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 509 (E.D. Pa. 2008) (citing *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)).

Ambiguous policy language is to be construed in favor of the insured and against the insurer. *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983). This is done in order to "further the contract's prime purpose of indemnification" and because "the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). This applies in equal force when the insured is a sophisticated entity. *See ACandS, Inc. v. Aetna Cas. & Sur. Co.*, 764 F.2d 968, 973 (3d Cir. 1985) (citing *Standard Venetian*, 469 A.2d at 566). However, when the language of a policy is unambiguous "a court is required to give effect to that language." *Standard Venetian*, 469 A.2d at 566. Policy language is ambiguous if "reasonably intelligent people on considering it in the context of the entire policy would honestly differ as to its meaning." *USX Corp. v. Adriatic Ins. Co.*, 99 F. Supp. 2d 593, 609 (W.D. Pa. 2000) (quoting *Northbrook Ins. Co. v. Kuljian Corp.*, 690 F.2d 368, 372 (3d Cir. 1982)) (internal quotation marks omitted). A court makes the legal determination of whether policy language is ambiguous. *Metzger v. Clifford Realty Corp.*, 476 A.2d 1, 5 (Pa. Super. Ct. 1984). When possible, "a court should interpret the policy so as to avoid ambiguities and give effect to all of its provisions." *Little v. MGIC Indem. Corp.*, 836 F.2d 789, 793 (3d Cir. 1987).

### a. Whether MMIC's Duty to Defend was Triggered

An insurer's duty to defend is triggered whenever the factual allegations of a complaint against the insured "may *potentially* come within the coverage of the policy." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517 (3d Cir. 2012) (citing *Erie Ins. Exch. v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (Pa. 1987)) (emphasis in original). To determine whether a claim against an insured potentially comes within coverage of the policy, the "four corners of the insurance contract" are compared "to the four corners of the complaint." *Am. & Foreign Ins. Co. v. Jerry's Sport Center, Inc.*, 2 A.3d 526 (Pa. 2010). The "factual allegations of the underlying complaint against the insured are to be taken as true and liberally construed in favor of the insured." *Frog*, 193 F.3d at 746. The particular cause of action that is pled is not determinative as to whether coverage is triggered, rather, it is necessary to look at the facts alleged in the complaint. *Hearn*, 93 A.3d at 884 (citing *Erie Ins. Exch. v. Fidler*, 808 A.2d 587, 590 (Pa. Super. Ct. 2002)). But, ordinarily, an insurer's duty to defend will not be triggered unless and until the insured requests a defense. *See Gen. Refractories Co. v. First State Ins. Co.*, 94 F. Supp. 3d 649, 663 (E.D. Pa. 2015) (citing *Widener Univ. v. Fred S. James & Co., Inc.*, 537 A.2d 829, 832 (Pa. Super. Ct. 1988)).

"The duty to defend has been held to be broader than the duty to indemnify." *C. Raymond Davis & Sons, Inc. v. Liberty Mut. Ins. Co.*, 467 F. Supp. 17, 19 (E.D. Pa. 1979) (citing *Gedeon v. State Farm. Mut. Auto. Ins. Co.*, 188 A.2d 320, 321–22 (Pa. 1963)). If an insured does not have a duty to defend, then it cannot have a duty to indemnify. *Hearn*, 93 A.3d at 884.

There is no dispute that the Loy Litigation Matter fell within the coverage terms of the Policy, which was in effect at the time of the alleged incident, such that it would definitionally trigger MMIC's duties to provide coverage. (*See* Am. Compl. ¶ 59, ECF No. 9; NVR CSF ¶¶ 12, 14; NVR Requests for Admission ¶ 15, ECF No. 94-6). The Policy provided liability coverage for

"bodily injury" caused by an "occurrence" and obligates MMIC to "pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury or property damages to which this insurance applies." (NVR CSF ¶¶ 15–18). The Loy Litigation Matter is a personal injury suit initiated by an individual against Rusmur, NVR, and others that stemmed from a workplace accident on one of NVR's construction sites. (NVR CSF ¶ 4). Plainly, coverage for the defense costs and damages incurred related to this suit would fall within the coverage provisions of the Policy because NVR stood in a position such that it may be liable to pay damages to Gary Loy in connection with the incident. The NVR Property Damage claims are a different matter.

NVR claims that, per the Policy, MMIC is required to indemnify NVR for property damage and attorney fees associated with the NVR Property Damage Matter. (Am. Compl. ¶ 101). The Court disagrees. The Policy clearly states that coverage is provided for "sums that the *insured becomes legally obligated to pay as damages* because of "bodily injury" or "property damage" to which this insurance applies." (ECF No. 94-8 at 18) (emphasis added). Here, NVR was *seeking* damages from Rusmur in a negligence action. (NVR Property Damage Compl., ECF No. 9-3). However, "[g]eneral liability insurance policies are intended to provide coverage where the insured's product or work *causes* personal injury or damage to the person or property *of another*." *Ryan Homes, Inc. v. Home Indem. Co.*, 647 A.2d 939, 942 (Pa. Super. Ct. 1994) (emphasis added); *see also generally Aerojet-General Corp. v. Transport Indem. Co.*, 948 P.2d 909, 919–20 (Cal. 1997) (explaining general features of commercial general liability insurance policies). If any of the parties in the NVR Property Damage Matter were covered under the MMIC-issued CGL Policy at issue here, it was Rusmur—the Named Insured of the Policy—and the party accused of being liable for NVR's property damage. It is illogical to suggest that MMIC could be obligated to indemnify NVR after NVR *initiated* the lawsuit and would stand in a position to *collect*—rather

-13-

than pay—damages. *See Dale Corp. v. Cumberland Mut. Fire Ins. Co.*, No. 09-1115, 2010 WL 4909600, at *8 (E.D. Pa. Nov. 30, 2010) (finding that the duty to defend the insured under a commercial general liability policy was not triggered when the insured was a plaintiff in an action and there were no counterclaims filed against the plaintiff). As in *Cumberland*, there is no record evidence in this case that NVR was ever at risk of being held liable for damages, through counterclaims, cross-claims, or otherwise, in the NVR Property Damage Matter. And, because the duty to defend is "determined *solely* by the allegations of the complaint in the action" the complaint in the Loy Litigation Matter cannot be used to bolster the contention that MMIC had a duty to defend in the NVR Property Damage Matter, and vice versa. *See id.* (quoting *Kvaerner*, 90 A.2d at 896).

NVR's arguments attempting to escape the plain language of the Policy as to property damage are wholly meritless. NVR argues that the Master Contractor Agreement between NVR and Rusmur obligated Rusmur to indemnify NVR "for, and to hold them harmless against, and all liabilities, losses and costs (including all attorneys' fees) caused solely by the negligence of Contractor, its subcontractors[.]" (MCA at 4). Thus, according to NVR, MMIC is responsible for indemnifying NVR for its property damage on behalf of Rusmur because it is Rusmur's insurer. This argument has no support in the case law, and in the Court's estimation, serves only as an implied acknowledgement by NVR that this claim against MMIC is, in reality, a claim arising under the agreement that NVR had with Rusmur. NVR's theory of liability is also improper because it would rely on an extrinsic agreement of which MMIC was not a party. Such a theory is inconsistent with Pennsylvania law. *See Commerce & Indus. Ins. Co. v. Century Sur. Co.*, 313 F. Supp. 3d 877, 885 (S.D. Ohio 2018) (applying Pennsylvania law and rejecting a similar argument in a related setting).

-14-

NVR settled its dispute with Rusmur as part of the global mediation held on August 14, 2015. (Joint Stipulation, ECF No. 90). Though NVR purported to reserve "the right to pursue any future and direct claims which it may have by virtue of the fact that NVR is named as an additional insured on any policy of insurance to which a party is the primary insured," (*id.* ¶ 10), it never had any rights to reserve vis-à-vis MMIC in a direct suit solely based on its status as an additional insured under the Policy. The duties under the Policy in connection with the NVR Property Damage Matter ran solely from MMIC to Rusmur as an indemnitor.

The undisputed facts in this case and the plain language of the Policy indicate that MMIC had no duty to defend NVR in the NVR Property Damage Matter. Because MMIC had no duty to defend NVR in this matter, it had no duty to indemnify NVR in connection with the NVR Property Damage Matter. *Hearn*, 93 A.3d at 884. Thus, NVR's breach of contract claim in Count III of the Amended Complaint fails. Summary judgment will be granted to MMIC as to that claim and NVR's motion for summary judgment as to that claim will be denied.

b. NVR Compliance with Notice Provisions

NVR alleges that MMIC breached its duty to defend and/or indemnify NVR in the Loy Litigation Matter because the notice provisions were satisfied by Rusmur providing notice to MMIC and alternatively because MMIC was not prejudiced by any purported late notice by NVR. As a preliminary matter, it is undisputed that, literally speaking, MMIC was aware of the occurrence and the lawsuits and had actively participated in them on behalf of Rusmur through their conclusion on August 14, 2015. (NVR Requests for Admission ¶¶ 1, 3–6; *see also* Deposition of Rosemary Ploeger ("Ploeger Dep.") at 55:6–11, ECF No. 97-12). The issue for the Court is whether NVR complied with the notice provisions of the Policy, not merely whether MMIC was aware of the underlying lawsuits. This is so because even though MMIC was aware that NVR was

being sued the record does not reflect that MMIC was (prior to NVR's request at the mediation) aware that NVR intended to seek coverage under the Policy. There are two relevant provisions found in Section IV of the CGL policy: Section 2(a) and Section 2(c). Section 2(a) is a notice provision, and neither party disputes this. The parties do dispute, however, whether Section 2(c) is also a "notice" provision and whether such provision imposes additional duties on NVR. These provisions will be addressed in turn.

### Section 2(a)

Section 2(a) imposes a duty on "you" to "see to it that [MMIC is] notified as soon as practicable of an "occurrence" or an offense which may result in a claim." (Policy at 28). The Policy defines "you" as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy." (*Id.* at 18). Rusmur—not NVR—is a "Named Insured" under the policy. (Pl.'s CSF ¶ 14, ECF No. 93).

This Court is unaware of any Pennsylvania court that has held whether the precise policy provision here—Section 2(a) of a CG 0001 (12-07) form—imposes a duty on an additional insured to provide independent notice to an insurer of an "occurrence." At least one Pennsylvania court, under similar facts, has held that notice "from any reliable source was all that is required to trigger" an insurer's responsibility to defend. *Phila. Elec. Co. v. Aetna*, 484 A.2d 768, 771 (Pa. Super. Ct. 1984). However, the policy language interpreted by the *Philadelphia Electric* court stated that "written notice shall be given by *or on behalf of* the insured." *Id.* That policy language is plainly broader than the language in Section 2(a) of this Policy. Other courts, interpreting Pennsylvania law, have likewise held that an additional insured need not provide additional notice to an insurer when the policy language specifies that notice "shall be given by or on behalf of" an insured. *See Western Freight Ass'n v. Aetna Cas. & Sur. Co.*, 255 F. Supp. 858, 861 (W.D. Pa. 1966);

*Bethlehem v. Cont'l Cas. Co.*, 208 F. Supp. 354, 355 (E.D. Pa. 1958). Given the primacy of the policy language in policy interpretation, the Court believes that these cases—construing different language—lack persuasive force in interpreting the Policy at issue here.

The Court concludes that Section 2(a) is unambiguous and that case law is not needed to inform its interpretation. Section 2(a) imposes an obligation on "you"—explicitly and unambiguously defined as "the Named Insured shown in the Declarations, and any other person or organization qualifying as a Named Insured under this policy"—to "see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim." (Policy at 18, 28). Nothing in that provision mentions an additional insured party, let alone could be read as imposing an independent obligation for an additional insured to provide notice. Given the express definition of "you" within the Policy, the application of this provision to the facts of this case is straightforward. Under the Policy, the Named Insured (Rusmur) had an obligation to notify MMIC of the propane heater explosion "as soon as practicable." It is undisputed that Rusmur did so. (ECF No. 97-11). The Court concludes that there is no reasonable alternative reading or interpretation of this provision and thus it is unambiguous. Accordingly, it will be given the effect of its plain language. *Standard Venetian*, 469 A.2d at 566. NVR had no obligation under Section 2(a) to notify MMIC of an "occurrence," and thus NVR did not violate this provision.[2]

### Section 2(c)

Section 2(c) is another matter. For one, the provision uses different language. Rather than imposing a duty solely upon "[y]ou," as in Section 2(a), Section 2(c) imposes various duties upon

---

[2] Though the policy language here is unambiguous, the Court takes note of at least one other court adopting the same construction of Sections 2(a) and 2(b) in this Policy. *See Am. Nat. Fire Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 796 N.E.2d 1133, 1142 (Ill. App. Ct. 2003) (holding that only the named insured under a commercial general liability policy had an obligation under Sections 2(a) and 2(b) to notify the insurer of an occurrence because those sections specifically and only required "you," *i.e.*, the named insured, to provide notice).

"[y]ou *and* any other involved insured." (Policy at 28) (emphasis added). It is clear from a plain

reading of this provision that NVR, as an additional insured under the Policy, had *some* duty or

obligation under Section 2(c). The parties dispute what the extent of this duty was.

The Court finds the Third Circuit's reasoning in *Scottsdale Insurance Company v. Bieber*

*& Associates, Inc.*, 105 F. App'x 340 (3d Cir. 2004), a non-precedential decision of that Court, to

be informative.[3] There, the Third Circuit analyzed the precise notice provisions at issue here.

Scottsdale, the insurer, provided a commercial general liability policy to Bieber & Associates, a

private security agency. *Id.* at 341. An individual sued Bieber after he was assaulted at a concert

at which Bieber provided security. *Id.* Scottsdale initially learned of the claim in 1996 when the

concert promoter's insurer sent Scottsdale a letter notifying it of the assault. *Id.* Bieber did not

respond to the suit and never forwarded the summons, complaint, or any other documents related

to the suit to Scottsdale. *Id.* at 342. Bieber eventually contacted Scottsdale and requested a defense

after receiving a notice of default, and Scottsdale provided a defense under a reservation of its

rights against Bieber. *Id.*

The Third Circuit reversed the district court's holding that Scottsdale's initial notice of the

claim from the concert promoter excused any obligations that Bieber had to notify Scottsdale of

the suit. *Bieber*, 105 F. App'x at 343–44. Rather, the Third Circuit held that each of Sections 2(a),

2(b), and 2(c) describe independent events in which an insured must act and provide notice to its

insurer. *Id.* at 343. Namely, Section 2(a) imposes a duty on insureds to provide initial notice of

potential suits against them so that their insurers can be proactive in their investigation of potential

claims and Section 2(b) imposes a duty on insureds to notify their insurers when such claims are

---

[3] A non-precedential decision from the Third Circuit is not binding on this Court, *see United States v. Nagle*, 803 F.3d 167, 182 n.9 (3d Cir. 2015) (citing 3d Cir. Internal Operating Procedure 5.7), but may be cited as persuasive authority. *See Prudential Prop. & Cas. Ins. Co. v. Jefferson*, 185 F. Supp. 2d 495, 499 n.1 (W.D. Pa. 2002).

actually filed. *Id.* These are independent obligations because, "[n]ot every occurrence for which an insured faces potential liability will result in the filing of a claim, and not every unresolved claim will result in the filing of a lawsuit." *Id.* at 344. Relevant here, the Third Circuit described Section 2(c) as "specifically and unequivocally" imposing "a continuing duty to provide the insurer with legal papers it receives in connection with an ongoing claim" and that this was "an independent ground for finding" that the insured was required to provide notice of the claim against it. *Id.*

  *Bieber* can be read as emphasizing the importance of an insurer to have awareness of its potential claims throughout all stages of potential and ongoing litigation against its insured. *See also Trustees of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 897 (3d Cir. 1987) ("[T]he purpose of a policy provision requiring notice . . . is to give the insurer an opportunity to acquire, through an adequate investigation, full information about the circumstances of the case, on the basis of which, it can proceed to disposition, either through a settlement or defense of the claim.").

  In *Bieber*, there was a factual dispute as to whether Scottsdale had actual or constructive knowledge of the lawsuit against Bieber. 105 F. App'x at 344. But this determination went to whether Scottsdale was prejudiced by Bieber's noncompliance with the notice provisions—not to whether Bieber had complied with the policy's provisions. *Id.* The Third Circuit explicitly held that Scottsdale's knowledge of the potential claim from another source did not relieve Bieber of its independent obligation to comply with the notice provisions of the policy. *Id.*

  NVR argues that it did not fail to comply with the notice provisions of the Policy because MMIC had knowledge of the underlying incident, claim, and pending lawsuit from Rusmur. NVR also argues in its Reply that MMIC "fails to identify any "demands, notices, summonses or legal papers" it did not receive." (NVR Reply Br. in Supp. at 3, ECF No. 113) (quoting Section 2(c) of

the Policy). Even if true, this contention misses the mark. The language of Section 2(c) is unambiguous—the continuing duty to send the "demands, notices, summonses or legal papers" applies to the Named Insured "*and* any involved insured." (ECF No. 94-8 at 28) (emphasis added).

NVR essentially argues that it was unimportant for them to comply with the Policy's provisions in Section 2(c) because Rusmur had already sent the documents listed in Section 2(c) to MMIC. It may be true, as NVR suggests, that its compliance with Section 2(c) would have resulted in some redundancies as far as the documents that MMIC was receiving. But this assertion implies that Section 2(c) of the Policy is only in place so that the insurer has copies of the legal papers in a pending suit. It bears emphasizing that NVR did not even request a defense from MMIC until *three years* after the Loy Litigation Matter began. NVR now claims that they believed they were entitled to a defense from the beginning of the litigation. (Sack Dep. II at 22:2–5). Complying with Section 2(c) and providing MMIC with the papers from the Loy Litigation Matter would have at least provided notice to MMIC that NVR was seeking such a defense. NVR might not have viewed it as a big deal that they did not comply with Section 2(c), but this was not their call to make. The language of the Policy was unambiguous—they needed to "immediately send [MMIC] copies of any demands, notices, summonses or legal papers received in connection with the claim," (Policy at 28), and they failed to do so.

Relatedly, the Court is wholly unpersuaded by NVR's contention that it had no duty to provide MMIC with the documentation related to the suits because it was waiting on MMIC to approach NVR regarding a defense. (Sack Dep. II at 23:12–20). The Court is aware of no controlling authority—nor has NVR cited to any—that obligates an insurer to approach an insured about assuming a defense that had not been requested. Cases from other jurisdictions directly refute this contention. *See Erie Ins. Exch. v. Virgin Islands Enters, Inc.*, 264 F. Supp. 2d 261, 264 (D.V.I.

2003) ("Mere knowledge of a potentially covered claim by an insurer is not enough to constitute a tender. The insurer must know that its participation is desired by the insured.") (quoting *Aetna Cas. & Sur. Co. v. Chi. Ins. Co.*, 994 F.2d 1254, 1261 (7th Cir. 1993)). The *earliest* time in which NVR gave any indication that it desired a defense or indemnification from MMIC, let alone tendered a defense, was at the mediation on August 14, 2015. Until this time, because NVR "failed to take the crucial, preliminary step of tendering [its] defense" to MMIC, NVR's policy coverage "was never triggered." *See Aetna*, 994 F.2d at 1261. Further, NVR's belief that the onus was on MMIC to approach NVR about assuming a defense is belied by the fact that NVR provided its other liability insurance provider, AIG/Chartis, with notice of the explosion within days of its occurrence, (Sack Dep. I at 30:8–11), and NVR's admission that, prior to the lawsuits at issue here, it *never* had "an experience where an insurance company affirmatively stepped up and asked if [NVR was] requesting a defense." (Sack Dep. II at 70:14–20).

NVR's other justification for its noncompliance with Section 2(c) is that it did not have a copy of the Policy until the litigation began, and thus it would be unfair to expect them to comply with it. This argument is also meritless. Even though NVR did not obtain a copy of the Policy (that NVR requested in its MCA with Rusmur) until discovery in the Loy Litigation Matter, (NVR CSF ¶ 9; *see also* ECF No. 108-3), there is nothing in the record that suggests that NVR was restricted in any way from obtaining a copy whenever it would have desired one. It strikes the Court as strange (at least) that NVR, a sophisticated business entity, argues that it can be excused from compliance with the Policy that they themselves requested because they had not reviewed the Policy. NVR does not cite to any legal authority that supports such an assertion, nor is the Court aware of any. Further, it is undisputed that NVR obtained a copy of the Policy on January 15, 2013, *over two years before* NVR eventually first requested a defense and indemnification from

MMIC. (*Id.*). Section 2(c) of the Policy is unambiguous in imposing a continuing notice requirement upon all involved insureds. Even if the Court would lend credence to NVR's "we only didn't comply because we didn't have a copy of the Policy" argument, it would be belied by NVR's *continued* violation of the Policy's notice provisions even after it indisputably obtained a copy of the Policy.

It appears to the Court that NVR wants to have its cake and eat it too. During the three-year pendency of the underlying litigations NVR failed to give any indication to MMIC that it desired or expected a defense from MMIC. NVR assumed and retained control of its defense from the onset of the Loy Litigation Matter, gave notice and a defense demand to another involved carrier, initiated the lawsuit in the NVR Property Damage Matter, actively investigated and litigated both matters for over three years, and then (and only then) asked MMIC to pick up the tab at the fifty-ninth minute of the eleventh hour. Now, NVR attempts to turn the tables by feigning ignorance of the notice requirements of the Policy and arguing that the onus was on MMIC to approach NVR regarding a defense in the litigations. In the Court's estimation, it is baseless for NVR to argue that it was ignorant of its duty to provide notice to MMIC (its liability insurer) in the event that it was sued. After all, NVR provided notice to AIG/Chartis within days of the accident, (Sack Dep. I at 30:8–11), and forwarded a copy of the Loy Litigation Matter summons and complaint to AIG/Chartis through a third-party administrator on March 19, 2012. (ECF No. 97-8). Under the AIG/Chartis plan, NVR retained the ability to choose its defense counsel. (ECF No. 97-29). This all serves to bolster the conclusion that NVR's failure to provide timely notice to MMIC was a deliberate and strategic litigation tactic rather than an innocent oversight.

Nonetheless, NVR's subjective motivation is not an element of this claim, and the Court cannot make credibility determinations at the summary judgment stage. However, no credibility

determination is necessary to conclude that NVR breached Section 2(c) of the Policy. Based on the uncontroverted facts in the record and the unambiguous language of the Policy, NVR had a duty as an "involved insured" to provide MMIC with copies of the "demands, notices, summonses or legal papers received in connection" with the suit. (Policy at 18). NVR did not do these things. (Pl.'s CSF ¶ 48). Therefore, they breached this provision of the Policy. NVR claims there is no harm and no foul because MMIC knew about the Loy Litigation Matter from the beginning. But whether MMIC actually had notice of the claims and knowledge of the legal proceedings is a consideration as to whether MMIC was prejudiced by NVR's noncompliance—not whether NVR had actually complied. That issue—whether MMIC was prejudiced by NVR's late notice—is a closer question.

     c.  Prejudice to MMIC

     The seminal case of *Brakeman v. Potomac Insurance Company* established that, under Pennsylvania law, an insurer that refuses to defend or indemnify an insured based upon late notice bears the burden of proving both that the insured breached the notice provision of the policy *and* that the insurer was actually prejudiced by the late notice. 371 A.2d 193, 196 (Pa. 1977). The *Brakeman* court rejected a strict contractual approach to policy interpretation because "such a position fails to recognize" that "an insurance contract is not a negotiated instrument; rather its conditions are by and large dictated by the insurance company to the insured." *Id.* The rule in *Breakman* applies to insurance policies involving sophisticated entities. *See Pac. Emp'rs Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 435 (3d Cir. 2012) (citing *Trustees*, 815 F.2d at 897).

     A review of the facts of *Brakeman* would be helpful. The dispute arose out of a motor vehicle accident in which a seventeen-year-old motorcyclist collided with an automobile in

Meadville, Pennsylvania. 371 A.2d at 194. Potomac Insurance provided an automobile liability insurance policy to the motorcyclist. *Id.* The motorcyclist did not notify Potomac of the accident until the automobile driver's attorney sent a letter indicating that a suit was being initiated. *Id.* This was approximately seven months after the accident occurred. *Id.* Potomac refused to defend the motorcyclist on the grounds that it received late notice. *Id.* In observing that the purpose of a notice requirement is "simply to prevent the insurer from being prejudiced" and not to "provide a technical escape-hatch by which to deny coverage," the Supreme Court of Pennsylvania held that late notice by an insured will not excuse an insurer's refusal to defend unless the insurer can demonstrate it was actually prejudiced by the late notice. *Id.* at 197–98 (quoting *Miller v. Marcantel*, 221 So. 2d 557 (La. App. 1969)).

MMIC implores the Court to distinguish *Brakeman* on its facts. There is Pennsylvania authority to support doing so. *See, e.g.*, *Metal Bank of Am., Inc. v. Ins. Co. of N. Am.*, 520 A.2d 493, 497 (Pa. Super. Ct. 1987) ("We must view *Brakeman* . . . in the framework of its factual situation."). In the Court's estimation, the facts of the instant case differ in significant and legally material respects. NVR is a sophisticated commercial entity, whereas the insured in *Brakeman* was an adolescent that likely lacked any experience with insurance matters or civil litigation. Nonetheless, the law is clear that the *Brakeman* rule applies to sophisticated entities. *Trustees*, 815 F.2d at 897. At minimum, however, in the Court's estimation, the policy rationales underpinning the *Brakeman* rule are lessened when a sophisticated entity such as NVR is involved, and when that entity otherwise robustly engaged in insurance matters in the very civil litigation for which coverage is sought. *Cf. Brakeman*, 371 A.2d at 197 (explaining that a notice requirement "normally operates to benefit the insured as well as the insurance company" because the insurance company, through expertise and resources unavailable to the average insured, can gain "full information

-24-

about the circumstances of the case" which it can use to "proceed to disposition").

Unlike the motorcyclist in *Brakeman*, NVR is a sophisticated entity that had the resources to conduct its own investigations and control its litigation strategy. The record indicates that NVR did just that. (NVR CSF ¶ 36). NVR plainly chose to retain this control rather than cede it to MMIC. Similar considerations were weighed by a Pennsylvania court in determining that an insurer who had no notice of potential liability was actually prejudiced by late notice. *Metal Bank*, 520 A.2d at 498 ("We are dealing with a sophisticated insured, advised by counsel for many years, which had done nothing to alert its insurance carriers that they may be exposed to substantial liability[.]").[4]

Even if NVR strategically withheld notice from MMIC, the law remains clear: the record must demonstrate that MMIC was actually prejudiced by NVR's late notice in order for it to avoid its obligations to defend and/or indemnify under the Policy. *See Harrisburg Area Cmty. Coll. v. Pac. Emp'rs Ins. Co.*, 682 F. Supp. 805, 811 (M.D. Pa. 1988) ("[D]efendant has the burden of proving prejudice. The mere possibility of prejudice is not sufficient."). What exactly constitutes "prejudice" remains unsettled under Pennsylvania law. Prejudice has been found when an insurer was not notified of an occurrence until nine years after it occurred and litigation had progressed to a point that a settlement was a *fait accompli*. *Metal Bank*, 520 A.2d at 498. This is so because late notice deprived the insurer of the opportunity to "gain early control of the proceedings" and "investigate and acquire information about the case." *Id.* The Third Circuit, interpreting Pennsylvania law in *Trustees* and taking a somewhat narrower view, explained that an insurer is

---

[4] MMIC also asks the Court to consider the fact that NVR did not pay premiums to MMIC for coverage under the Policy. While *Brakeman* noted the fairness considerations of an insurer accepting premiums but denying coverage, *see* 371 A.2d at 198, the Court is aware of no authority (in Pennsylvania or otherwise) that suggests that paying premiums is a condition precedent to applying the *Brakeman* rule requiring a showing of actual prejudice by the insurer.

prejudiced by late notice only if it can show that the insured's noncompliance with the contract "led to disadvantageous, substantive results" and "proximately caused its insurer damages." 815 F.2d at 898. In other words, an insurer must be able to "demonstrate that earlier notice would probably have led to a more advantageous result" and further that "prejudice requires a showing that the lateness of notice probably altered the result." *Id.* at 899; *see also Westchester Fire Ins. Co. v. Treesdale, Inc.*, No. 05-cv-1523, 2008 WL 1943471 at *16 (W.D. Pa. May 2, 2008) (applying the standard in *Trustees* in determining whether there was prejudice from late notice). The altered "result" is not necessarily a different finding of liability or a more favorable verdict at trial, rather, what constitutes "disadvantageous, substantive results" is interpreted more generally. *See Am. Guar. & Liab. Ins. Co. v. Simon Roofing & Sheet Metal Corp.*, 930 F. Supp. 2d 1331, 1340–41 (S.D. Fla. 2013) (citing *Trustees*, 815 F.2d at 898, and applying Pennsylvania law), *aff'd*, 551 F. App'x 527 (11th Cir. 2014). Another court applying Pennsylvania law explained that prejudice may be found when a delay causes witnesses to be unavailable, evidence to be destroyed, or when the delay otherwise prevents the insurer from participating in the defense of the action or in settlement negotiations. *Rite Aid Corp. v. Liberty Mut. Fire Ins. Co.*, 414 F. Supp. 2d 508, 520–21 (M.D. Pa. 2005); *see also Taylor v. Fortis Benefits Ins. Co.*, No. 07-528, 2008 WL 3249940, at *4 (W.D. Pa. May 1, 2008) (finding that an insurer was prejudiced by late notice of a claim because witnesses and medical evidence was lost in the intervening years and the insurance company "could not fully investigate the claim").

This case does not fall neatly within any of the scenarios presented by the decisions above. In *Metal Bank*, attorneys for the insured sent a letter to its insurer stating that "[t]hrough the determined and continued efforts of its attorneys, your insured has been able to reduce the liability sum to a fraction of the originally stated claim." 520 A.2d at 498. The Superior Court of

Pennsylvania held that this indicated that settlement was a *fait accompli*. In the Court's estimation, settlement progress had not quite advanced to that point in this case. All of the parties were at the table, presumably with the intent to resolve the cases, at the mediation held on August 14, 2015, when the coverage demand was made. But the record does not reflect that any agreements—final, tentative, or otherwise—had been reached at that point. Further, the Court notes that the record does not reflect that witnesses are now unavailable or that evidence has been destroyed. It is also undisputed that MMIC was actively participating in the litigation, including conducting its own investigations. (*See, e.g.*, NVR Requests for Admissions ¶¶ 1, 3–6). It is further undisputed that, via its defense and representation of Rusmur, MMIC was aware of the progress of the litigations. (*Id.*).

With that all being said, the Court further concludes that there is sufficient other record evidence that establishes as a matter of law that MMIC was actually prejudiced by NVR's late notice. The two specific matters for which NVR now seeks reimbursement of its defense costs had been litigated for over three years before NVR gave MMIC any indication that it desired or expected a defense in the matters. Settlement may not have been a *fait accompli*, but it was well on its way to getting there, and NVR had incurred significant expenses to get to that point. It is undisputed that MMIC was wholly deprived of the opportunity to select the attorneys that would defend NVR in the matter and was also deprived of the opportunity to control the theory, strategy, and costs of the defense. (Ploeger Dep. at 55:20–56:6). In particular, the very expenses that NVR seeks here in terms of defense costs and fees were a *fait accompli* by the time NVR made its late-breaking defense/coverage demand. They were sunk costs that MMIC was deprived of considering or ameliorating. This is not only an *opportunity* afforded to the insurer in a commercial general liability policy, but a *right* of the insurer that is subsumed within the duty to defend. *Widener Univ.*,

-27-

537 A.2d at 833 n.9 ("Duty to defend insurer has right to defend litigation and to select counsel.") (citing *ACandS*, 764 F.2d at 975) ("[T]he right to control settlement contemplates the right to control the defense."). MMIC was not given notice of NVR's desire for a defense or indemnification until way after NVR hired its lawyers and was ringing up counsel fees, significant discovery had been completed, the case was proceeding to trial, and NVR and AIG had already discussed settlement authority and amount. (Sack Dep. I at 53:8–15). Those matters were, under the Superior Court of Pennsylvania's rubric, an unreasonable *fait accompli*. *See Metal Bank*, 520 A.2d at 498–99. That is, NVR "alone conducted extensive investigations, retained counsel, defended the litigation and attempted to work out a settlement agreement. These were matters in which [the insurer] should have participated, if they are going to be called upon to pay the very substantial costs of settlement and counsel fees." *Id*. at 499.

As aptly observed by James Sack, NVR's General Counsel, MMIC was "not on the sidelines" during the Loy Litigation Matter. (Sack Dep. I at 36:7). But just because MMIC was on the playing field—and in some ways was striving for the same goal as NVR—it is clear that MMIC was not on "Team NVR," let alone in the NVR team huddle, for more than three years. Given how the matters resolved, NVR essentially tossed MMIC a uniform with the clock winding down in the fourth quarter and now wants to blame them for not suiting up earlier and winning the game for them on a last-minute kick, all the while being on the hook for NVR's "payroll" (for which there was no "cap"). Extending this analogy, the prejudice to MMIC is both real and indisputably clear. Even if MMIC was "playing" in the game the whole time, it did not have the benefit of strategizing with NVR, controlling the costs that NVR now expects it to pay, or even knowing for sure that NVR wanted MMIC on its team, until the outcome was basically decided and there was little that anyone could do to affect the result. Logically, under the same analogy, this was inherently

-28-

prejudicial to MMIC since NVR now wants MMIC to own the ultimate result of the entire game, despite hastily being asked to join up with Team NVR with only seconds left.

Had NVR had the opportunity to strategize with NVR and exert influence and control over the litigation and its costs MMIC could have obtained a different and more beneficial result, and certainly would have been positioned to control the litigation costs NVR now wants to be paid. And on top of that, NVR's actions deprived MMIC of the real ability to actually participate in the settlement decisions made by NVR at essentially the same time that NVR was first making its oral demand for a defense and indemnity. For example, NVR's decision to "front" settlement funds was also a *fait accompli* at a point before MMIC had any real opportunity to engage on behalf of NVR, as was the settlement range that NVR had discussed (without MMIC's input) prior to the mediation. At the time that MMIC was first demanded to provide coverage, NVR had already incurred most of the considerable expenses it seeks to recover here and unilaterally made the key decisions toward resolution of the case. *Cf. Hyde Athletic Indus., Inc. v. Cont'l Cas. Co.*, 969 F. Supp. 289, 300–01 (E.D. Pa. 1997) ("Plaintiff's conducted settlement negotiations and made crucial decisions . . . without notifying its insurers . . . This is clearly a case in which the insurance companies, if given an opportunity for early control over the litigation, might have chosen a difference strategy to resolve the case."). At the absolute minimum, MMIC would have had control over the legal fees for which they are now being asked to foot the bill. NVR chose its own counsel in this matter, and as described by the claims counsel for MMIC, were paying a "high rate" for these lawyers compared to "[t]he going rate for insurance defense in the Western Pennsylvania area." (Ploeger Dep. at 57:11–17). MMIC did not have the opportunity to assign defense counsel of its choosing, (*id.* at 56:1–5), and thereby indisputably lost the opportunity to control those costs. To the point, NVR now seeks $313,148.85 for defense of the Loy Litigation Matter, (NVR Resp.

-29-

CSF in Opp. ¶ 89, ECF No. 104; *see also* ECF No. 104-3), whereas MMIC paid only \$32,050.19 in attorney fees and expenses for *both* the Loy Litigation Matter and the NVR Property Damage Matter. (Aff. of Rosemary Ploeger, ECF No. 111-10). At least one other federal court, applying Pennsylvania law, specifically noted that incurred legal fees of which the insurer had no control over weighed in favor of finding prejudice to the insurer. *See Clemente v. Home Ins. Co.*, 791 F. Supp. 118, 121 (E.D. Pa. 1992) ("[T]oday legal fees can often be more financially burdensome that the judgments which the fees are incurred to avoid."), *aff'd*, 981 F.2d 1246 (3d Cir. 1992).

MMIC further argues that it was prejudiced by NVR's advanced payment of costs related to its defense and the settlement of the underlying litigations. MMIC cites to *McMahon v. Medical Protective Company*, 92 F. Supp. 3d 367 (W.D. Pa. 2015), and *Caplan v. Fellheimer*, 5 F. Supp. 2d 299 (E.D. Pa. 1998), for the proposition that insurers have no duty to reimbursed insureds for "pre-tender costs voluntarily made by the insured." (Def. Br in Supp. at 14, ECF No. 95). In the Court's estimation, both *McMahon* and *Caplan* discussed payments made explicitly for settlement purposes. While the record is a bit hazy as to whether NVR had ever made a voluntary payment directly toward settlement, James Sack testified at his deposition (on behalf of NVR as its Rule 30(b)(6) designee) that NVR had "fronted" money at the mediation in order to get the case settled. (Sack Dep. II at 34:18–21). What follows is a complicated trail of reimbursements Sack could not confidently recall. (*Id.* at 35–37). It appears undisputed to the Court, however, that NVR undoubtedly outlaid funds toward the settlement in advance, even if it was later reimbursed for at least part of that amount, and the amount of that "advance" was the "retained limit" in NVR's policy with AIG. (*Id.* at 34:18–21; ECF No. 97-20). Given Mr. Sack's testimony, as confirmed by the balance of the record, the Court concludes as a matter of law that this trail of payments, reimbursements, and expenditures made and received by NVR in connection with these matters is

-30-

both part of its claim here, and were amounts that NVR paid at a point at which MMIC had, by NVR's actions, been deprived of any meaningful opportunity to participate in that payment decision. Thus, MMIC was prejudiced in terms of that payment by NVR's actions.

The Court concludes that the record is undisputed insofar has NVR had incurred thousands of dollars of pre-tender expenses in the form of legal fees and other costs associated with defending the Loy Litigation Matter, and unilaterally determined the course of the defense and settlement that it now asks MMIC to pay for. Even if some these expenses were not directly applied toward a settlement—so as to fall within the purview of *McMahon* and *Caplan*—the Court nonetheless concludes that they are plainly dispositive of prejudice suffered by MMIC because they were incurred without MMIC's knowledge or consent, and are now the very costs NVR is asserting that MMIC must pay. Incurring such expenses also contravened Section IV 2(d) of the Policy, which provides that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense . . . without our consent." (Policy at 28). This language is unambiguous insofar as it applies broadly to defense costs and expenses and plainly includes, but is not limited to, payments applied toward a settlement.

The Court is also unconvinced by NVR's arguments that MMIC is "benefitting" from its "reflexive" denial of NVR's request to take up its defense and indemnify it for defense expenses. (*See, e.g.*, Pl.'s Br. in Opp. at 12, ECF No. 103). NVR *orally* requested a defense during a mediation after three years of litigation. (MMIC CSF ¶ 55). NVR did not provide MMIC with an accounting of expenses, which MMIC could reasonably deduce would be substantial given that litigation had been ongoing for *three years* at that point. NVR also suggests that MMIC "cannot involve itself in the underlying litigation, attend mediation in the underlying cases, reflexively deny NVR's demand for coverage without any analysis or investigation, sit silent on behalf of

NVR while the cases settle, and then claim it is not obligated to provide coverage to NVR because NVR's costs and fees were incurred without Motorists' consent." (Pl.'s Br. in Opp. at 12). This is, of course, a misleading (in actuality a false) characterization of what actually occurred. MMIC "involved itself in the underlying litigation" and was "attend[ing] the mediation" because its named insured—Rusmur—provided MMIC with notice of the occurrence and lawsuits and tendered a defense. NVR never did any of that. And MMIC has provided uncontroverted evidence that NVR's "costs and fees were incurred without Motorists' consent" well-before the cases settled and well-before NVR requested a defense. NVR essentially made all of its decisions regarding its defense for over three years, racking up its bills the entire time, and now expects MMIC to pick up its tab at the end. That's not how this works. MMIC has a duty to defend and indemnify under the Policy, but also "the right and duty to defend the insured against any "suit" seeking those damages." (Policy at 18); *see also ACandS*, 764 F.2d at 975. NVR's late notice completely deprived MMIC of the ability to exercise this right vis-à-vis NVR both as to fees/costs and the "fronting" of settlement money, and MMIC was conclusively prejudiced by this.

MMIC also represents, and NVR does not dispute, that NVR paid eight times more than Rusmur did as part of the settlement. (MMIC CSF ¶ 58). In fact, Rusmur contributed the smallest amount to the settlement among the defendants in the Loy Litigation Matter, (*id.*), despite NVR's position throughout the pendency of that litigation that it was not liable for Loy's injuries and that Rusmur was solely liable to Loy. (NVR CSF ¶ 5). Plainly, Rusmur—who was provided a defense by MMIC throughout that entire litigation—obtained a far more advantageous outcome than did NVR, who decided to take its defense in its own hands. NVR's three-year delay deprived MMIC of the power to obtain a better result for NVR in the Loy Litigation Matter and thus MMIC was prejudiced by NVR's late notice in terms of having to potentially indemnify NVR for a larger

settlement amount.

In sum, the record demonstrates as a matter of law that MMIC was actually prejudiced by NVR's continuing failure to comply with Section 2(c) of the Policy and from NVR's late notice of its desire for a defense and/or indemnification. NVR retained its own attorneys for its defense without consultation with MMIC. These attorneys were significantly more expensive to retain and pay than the attorneys that MMIC retained for Rusmur, a party far more directly tied (according to NVR) to the liability in the Loy Litigation Matter. Additionally, by waiting over three years to involve MMIC on its behalf or to request a defense, NVR completely deprived MMIC of the opportunity to take control of the matter at an early stage and resolve it prior to the accumulation of those expenses. MMIC also advances a number of potential defenses that it would have risen in the matter. (MMIC Br. in Opp. At 13–15, ECF No. 106). Though the Court expresses no opinion as to whether any of these defenses would have been successful, it is beyond dispute that MMIC did not have the opportunity to raise them. Neither this Court, nor MMIC, can turn back the hands of time. Those opportunities are passed and gone, because of NVR's non-compliance with Section 2(c). MMIC was indisputably prejudiced by its inability to control NVR's defense, or the costs incurred in furtherance of it, until the end of the underlying litigation—when NVR expected payment for all of the expenses that they had accumulated up to that point along with what it "fronted" for settlement. Because MMIC breached a notice provision of the Policy and MMIC was actually prejudiced by NVR's late notice and non-compliance with the Policy, MMIC had no duty to defend or indemnify NVR in connection with the Loy Litigation Matter and NVR's breach of contract claim in Count II of the Amended Complaint fails. Summary judgment will be granted to MMIC as to that claim and NVR's motion for summary judgment as to that claim will be denied.

### d. Bad Faith

NVR also alleges that MMIC acted in bad faith in denying coverage. The Court disagrees and will grant summary judgment in favor of MMIC on this claim. "To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Condio v. Erie Ins. Exch.*, 899 A.2d 1136, 1143 (Pa. Super. Ct. 2006) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. Ct. 1999)). In other words, "[b]ad faith is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured." *Frog*, 193 F.3d at 751 n.9. A finding of bad faith requires more than "mere negligence or bad judgment" in denying a claim. *Winner Int'l Corp. v. Cont'l Cas. Co.*, 889 F. Supp. 809, 817 (W.D. Pa. 1994), *aff'd*, 54 F.3d 767 (3d Cir. 1995). Under Pennsylvania law, the clear and convincing evidence standard required to demonstrate bad faith "requires evidence so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Post*, 691 F.3d at 523 (internal quotations omitted). The insurer does not act in bad faith when the insurer does not breach its duty to defend or indemnify. *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 821 n.19 (3d Cir. 1994).

Because the Court has concluded that MMIC had no duty to defend or indemnify NVR for the Property Damage Matter or the Loy Litigation Matter, there cannot be a finding of bad faith for those refusals to provide coverage and NVR's bad faith claims fail. *Lucker*, 23 F.3d at 821 n.19. The NVR Property Damage Matter was plainly outside of the scope of coverage of the Policy, but the Court acknowledged that the Loy Litigation Matter fell within the scope of coverage. The Court concluded that MMIC was entitled to summary judgment on that claim because the

undisputed facts in the record demonstrate that MMIC was prejudiced as a matter of law by NVR's non-compliance with the Policy and late notice of its desire for a defense and/or indemnification. However, even if the Court would have concluded that the question of whether MMIC was actually prejudiced by NVR's conduct should proceed to the jury, the Court would still conclude that MMIC is entitled to summary judgment as to NVR's bad faith claims.

NVR has failed to produce evidence that MMIC's refusal to defend or indemnify in the Loy Litigation Matter was "frivolous or unfounded," let alone the requisite clear and convincing evidence necessary for a finding of bad faith. It is undisputed that NVR did not provide notice of any sort to MMIC that it desired a defense or expected indemnification for over three years. The Court has already held that this breached Section 2(c) of the Policy as a matter of law. Even if the Court would have ultimately concluded that a jury must determine whether MMIC was actually prejudiced by this late notice, it is undeniable that there is plenty of factual support for the jury to reach such a conclusion, obviating any bad faith claim.

Even at the moment that NVR first requested its defense, MMIC knew of the following facts that would reasonably lead it to conclude that it did not have to immediately provide NVR with a defense: MMIC did not choose counsel for NVR; NVR had been involved in the litigation for nearly three years and had likely amassed significant expenses and legal fees, over which MMIC had no control, for its defense efforts; MMIC was not provided an accounting of the defense costs for which it would potentially have to indemnify NVR; MMIC did not participate in early investigation or settlement discussions on behalf of NVR; and MMIC had no reason, until the moment that the oral demand was made, to believe that NVR desired a defense or expected indemnification from MMIC. Under these undisputed facts, it was not unreasonable for MMIC to refuse to defend or indemnify NVR, or at least to have paused before unflinchingly honoring

NVR's oral demand. That is, MMIC's refusal did not constitute a "reflexive" denial as NVR claims it did. Given the undisputed facts outlined above, MMIC could have justifiably been surprised by a sudden demand for a defense and indemnification after both parties had been aware that each other was involved in the litigation for over three years.

It also strikes the Court as a non-sensical suggestion that it constituted bad faith for MMIC to not immediately provide a defense and coverage in the middle of a mediation. Remember, at the time of the demand, NVR was indisputably in breach of Section 2(c) of the Policy and had provided no indication whatsoever that it expected or desired a defense from MMIC in these matters. Despite this, NVR suggests that MMIC was to reach the conclusion—at the mediation and without any documentation, accounting, or formal tender—that it (MMIC) had suffered no prejudice from NVR's late notice and thus owed NVR a defense. Or, if this was not possible, NVR suggests that MMIC should have stopped the mediation. Both of these suggestions are illogical. MMIC was present at the mediation on behalf of Rusmur. MMIC had Rusmur's interests to protect, and it may have been prejudicial to Rusmur (the insured that actually complied with the Policy) to stop the mediation. NVR has provided no authority that suggests that MMIC had a duty to drop everything, without analysis, and commence its representation on behalf of NVR as soon as NVR made an oral request for MMIC to do so. In short, the Court concludes as a matter of law that MMIC's refusal to provide coverage at the mediation was not "reflexive," and at any rate, was certainly not "frivolous or unfounded" so as to constitute bad faith.

This litigation in this Court has been pending for over two and a half years. MMIC and NVR have vigorously litigated this case, and MMIC has obviously yet to provide NVR with its requested defense or indemnification. That said, "an insurer does not act in bad faith by investigating and litigating legitimate issues of coverage." *Post*, 691 F.3d at 523 (quoting *J.C.*

*Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 368 (3d Cir. 2004). The legal and factual issues here are indicative that there are and were—at minimum—legitimate issues of coverage. Accordingly, the Court concludes that MMIC's refusal to pay up upon NVR's oral demand and continuing to this day—even if there were still open questions as to whether MMIC breached its duties to defend or indemnify—was and is not "frivolous or unfounded" and thus cannot and does not amount to bad faith.

## IV. CONCLUSION

For the foregoing reasons, NVR's Motion for Summary Judgment (ECF No. 74) will be DENIED and MMIC's Motion for Summary Judgment (ECF No. 78) will be GRANTED. The Court concludes that there was no obligation under the Policy for MMIC to defend or indemnify NVR in the NVR Property Damage Matter. The Court further concludes that NVR provided late notice to MMIC that it desired a defense and/or indemnification in the Loy Litigation Matter in contravention of Section 2(c) of the Policy. The undisputed facts in the record, viewed in the light most favorable to NVR, demonstrate that MMIC was prejudiced by this late notice and noncompliance as a matter of law, and thus MMIC had no duty to defend and/or indemnify NVR in connection with the Loy Litigation Matter. Because MMIC had no duty to defend or indemnify NVR in either of the underlying lawsuits, NVR's bad faith claims fail. Thus, MMIC's Motion for Summary Judgment will be GRANTED and all Counts in the Amended Complaint (ECF No. 9) will be DISMISSED.

An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Dated:     March 1, 2019
cc:         All counsel of record

-37-